FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

97 SEP -5 AM II: 39

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **JILL McKEWAN**, | ] |
| Plaintiff(s), | ] |
| vs. | ] CV-96-N-0905-S |
| **BOOKS-A-MILLION, INC.**, | ] |
| Defendant(s). | ] |

ENTERED

SEP 5 1997

## Memorandum of Opinion

### I. Introduction.

In this employment discrimination claim, the plaintiff, Jill McKewan, ("Ms. McKewan"), brings suit against her former employer, Books-A-Million, Inc. ("Books-A-Million"), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").[1] Specifically, Ms. McKewan's complaint alleges gender discrimination because a co-worker, Barney Wilborn, created a sexually hostile work environment. *Complaint* at 3. She also asserts the defendant retaliated against her because she complained of sex discrimination, *Id.* at 4, and that she was constructively discharged.

---

[1] Originally, Ms. McKewan sued both Books-A-Million and Mr. Wilborn. Her state-law claim for the tort of outrage against Wilborn was dismissed on April 21, 1997, by agreement of the parties.

37

The matter is presently before the court on the defendant's motion for summary judgment, filed June 5, 1997, and addressed to all remaining claims.[2]  The motion has been fully briefed and is ripe for decision. Upon due consideration, it will be denied.

## II.  Statement of Facts.[3]

In August of 1994, Books-A-Million hired McKewan to serve as Assistant to Jim Kelley ("Kelley"), the Director of Store Development. At that time, Wilborn worked for Books-A-Million as a construction manager, managing the construction and maintenance of Books-A-Million stores.  Both Wilborn and McKewan worked in an office dealing with Management Information Systems and Store Development, including construction of new stores.

For the first two months of her employment, McKewan was the only woman working in a room of ten to fifteen men, including Wilborn.  McKewan and Wilborn worked in adjacent cubicles separated by a partition about four to five feet high.  McKewan did not report to Wilborn, but rather both McKewan and Wilborn reported directly to Kelley.

McKewan alleges sexual harassment by her employer because Wilborn created a hostile work environment; specifically, she complains of  Wilborn's foul language, "anti-

---

[2] In a related matter, the court has for consideration defendant's motion to strike filed July 10, 1997, in which Books-A-Million has moved to strike portions of the plaintiff's affidavit, submitted in support of her opposition to summary judgment.  McKewan has had an opportunity to respond in the plaintiff's opposition to motion to strike filed July 23, 1997. The court will consider this matter contemporaneously with the motion for summary judgment and will disregard any portions of the affidavit not properly before the court on summary judgment.

[3] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

women comments," and unprofessional behavior, which included display of "vulgar and inappropriate materials related to sex or women's bodies," holding her up to ridicule, and inciting others to ostracize her. *Plaintiff's Affidavit* at ¶ 23, 24 (appended to Opponent's Response). McKewan does not object to occasional banter tinged with sexual innuendo, nor does she claim that occasional vulgarity is sexual harassment. McKewan does not claim sexual harassment from any employee other than Wilborn. *Plaintiff's Deposition* at 10-11.

Wilborn had a prior history of offensive behavior at Books-A-Million. According to Kelley, "Before I was hired I knew that Barney's (Wilborn's) behavior was an issue." *Plaintiff's Affidavit* at ¶ 9. One of Kelley's goals was to correct that situation. *Id.* Prior to any complaints by McKewan, Wilborn had been counseled to stop his practice of kissing the hands of women when he was introduced to them in the workplace.

Also, prior to complaints by McKewan, Sara Jones, Director of Security, complained about Wilborn's profanity. Ms. Jones had gone to the extent of keeping track of the large number of vulgar words used by Wilborn in his telephone conversations. Ms. Jones formerly reported to Wilborn, but requested and received reassignment because of Wilborn's behavior.

McKewan complains of behavior by Wilborn beginning in late September of 1994. McKewan overheard Wilborn, in a telephone conversation with someone else, say "I wouldn't have to have the AC men out here every other week if we didn't have so many fat

3

women in accounting."[4] *Deposition of Plaintiff* at 13. On another occasion, McKewan overheard Wilborn when she was leaving for lunch, but returned momentarily. He read phone messages, which she took for him, out loud to others and said, "What kind of brain does it take to write down a message like this." *Id.* at 18. McKewan responded, "If you don't like the messages that are being left, you need to talk to the people that are calling you because I'm writing down what they tell me to." *Id.* At 19. On still another occasion, McKewan overheard Wilborn, on the telephone, telling a contractor from Nashville not to communicate with Kelley. Wilborn said he would update Kelley as he saw fit. Then McKewan overheard Wilborn say that "Mr. Kelley did not know his head from his ass." *Id.* at 47.

That same month, McKewan complained to Kelley about Wilborn's foul language, about his comments about "fat women in accounting," and about his comments about Kelley. Kelley counseled Wilborn, instructing him to "keep his language clean." *Plaintiff's Notes* at 1.[5] Two days later, McKewan overheard Wilborn caution some of his co-workers that they had better be careful about what they said around McKewan because she had been offended by some of his language. *Id.* at 1. McKewan asserts that Wilborn described her as "trying to get everyone in trouble." *Plaintiff's Affidavit* at ¶ 30.[6] McKewan alleges

---

[4] The parties agree that approximately twenty to twenty-five women worked in the Accounting Department, of whom only two or three were overweight in appearance.

[5] For the purposes of Summary Judgment only, Defendant adopts certain allegations made by the Plaintiff in notes created for her attorney after her resignation from employment by Books-A-Million." *Movant's Statement of Facts* at ¶ 8.

[6] McKewan further characterizes Wilborn's warning as an attack on her character, indicating that she intended to "harm the others in the office for no reason except spite." *Plaintiff's Affidavit* at ¶ 30. Books-A-Million objects to such characterization as evidence because McKewan lacks personal knowledge about Wilborn's intent.

4

that subsequently her co-workers continued to use foul language in the workplace, often including references to her. *Id.* at ¶ 31. Her co-workers created a chart on a white board to track all employees' use of "cuss words," and both McKewan and Wilborn had incidents of profanity marked on this chart.[7]

On October 5, 1994, prior to a costume party, Donna Green, a female co-worker, described a costume to McKewan, including the fact that it was low-cut. Realizing that McKewan might be offended by her description, Ms. Green stopped and apologized to McKewan in case she had offended her. That same day, McKewan met with Christine Germanson ("Germanson"), Director of Human Resources, about her concerns. The parties dispute whether this was in response to the fact that McKewan was the only one not invited to the costume party. *Plaintiff's Notes* at 2, *Plaintiff's Affidavit* at ¶ 33.

In either case, McKewan informed Germanson about the comment by Ms. Green and that Wilborn had cautioned other employees "to be careful about what they said around [her]." *Plaintiff's Notes* at 2. McKewan claims, but Books-A-Million disputes, that she told Germanson these things "by way of example of the widespread impact of [Wilborn's] behavior, to point out that he was interfering with [her] interactions with co-workers, even female co-workers." *Plaintiff's Affidavit* at ¶ 33.

_____

*Defendant's Motion to Strike* at 1-3.

[7] McKewan further testifies that, at Wilborn's instigation, her co-workers "made foul language into a game in which the object was to taunt [her] and cause [her] distress." *Plaintiff's Affidavit* at ¶ 31. Books-A-Million objects to McKewan's characterization as evidence because McKewan lacks personal knowledge about her co-workers' intent. *Defendant's Motion to Strike* at 1-3.

5

On October 6, 1994, three males, Kelley, Wilborn and Larry Allen ("Allen") held a telephone conference in Kelley's office. When he emerged from the conference, Wilborn was, in McKewan's words, "very angry" and asked to speak with a co-employee about the meeting. *Plaintiff's Notes* at 2. McKewan overheard Wilborn tell the other employee that Allen was trying to blame them for a construction problem, that Allen was stupid and knew nothing about construction, and that he had no intention of listening to the "dumbshit" (indicating Mr. Allen). *Id.* Wilborn went on to say that he would do what he wanted behind the backs of Kelley and Allen. Wilborn then asked two of his co-workers to accompany him outside so they could continue their conversation.

Later that day, McKewan encountered a co-employee, Bob Warren, in the hall. Mr. Warren told McKewan to stay away from him because he did not want to get into trouble. This upset McKewan so much that she discussed it with a co-worker in another department. The co-worker offered to inform Kelley and suggested that McKewan go home for the day, which she did. That evening, Mr. Kelley called McKewan at home and asked her to meet with him and Germanson the next day to discuss the problems she was experiencing.

On October 7, 1994, at Kelley's suggestion, McKewan met with Kelley and Germanson, in the conference room, in order to explain her complaints about Wilborn. During this meeting, McKewan mentioned items that she had previously complained about, as well as the following: 1) Wilborn told other employees that Kelley and Allen were "so stupid that they didn't know their head from their asses"; 2) Wilborn said that another employee expected you to salute because she worked for the vice president; 3) Wilborn

6

called an employee, whose initials are D.D., by her initials or sometimes by "double D," and the employee thought he did so because of her bust size, but Wilborn told her that her bust size did not warrant it; and 4) Wilborn commented that another employee was "so stupid that she needed bread crumbs to find her way out of the fax machine." Germanson asked McKewan what action she wanted taken. McKewan said that she wanted the language stopped and she emphasized that she wanted no special treatment. McKewan, but not Books-A-Million, contends that she did not limit her request to Wilborn's foul language, but also "emphasized that [Wilborn's] anti-women comments were offensive." *Plaintiff's Affidavit* at ¶ 34.

After this meeting, Kelley counseled Wilborn about professionalism and language on the job. Then Kelley placed a warning in Wilborn's file regarding complaints about his behavior, specifically noting that any retaliatory conduct would result in his termination. Nevertheless, either Kelley or Germanson had told McKewan, in effect, "Barney (Wilborn) not being in this department is not an option, so we're going to have to work something out."

Although the parties dispute whether it occurred before or after Kelly counseled him,[8] Wilborn apologized to McKewan for his language and promised to make an effort to improve, to which McKewan responded, "I know that people cuss and I do it myself." McKewan went on to say that she did not appreciate what he was saying to people and some of his subject matter.

---

[8] McKewan's affidavit contradicts her own notes, both submitted as evidence by McKewan. *Plaintiff's Notes* at 3; *Plaintiff's Affidavit* at ¶ 35.

On October 17, 1994, employees of Books-A-Million attended the annual Anderson Family Dinner, sponsored by the family of Clyde Anderson, President of Books-A-Million at that time. At the dinner, Mr. Anderson introduced Wilborn to everyone and described how he had known "Barney" prior to his employment. Wilborn, in late November or early December 1995, told a group of employees, including McKewan, words to the effect, "Clyde (Mr. Anderson) was the one who hired me, and only Clyde will be the one to fire me."

On November 18, 1994, a group of co-workers, which included only men,[9] planned to go out for lunch, and Wilborn asked McKewan to go to "Sammy's"[10] with them. The parties dispute Wilborn's intentions by this invitation.[11] In any case, the group did not go to "Sammy's," and Wilborn has never been to "Sammy's."

The last week of November 1994, about a week after Books-A-Million opened a store at Wildwood, McKewan overheard a conversation between Wilborn and the store manager

---

[9] Books-A-Million's contention that this group included both men and women is unsupported by the evidence. Books-A-Million based its contention upon McKewan's testimony, "[Wilborn] asked me in front of *all* our co-workers in that area to go to Sammy's with him--with them." *Plaintiff's Deposition* at 24-25 (emphasis added). But, in response to the next question about exactly who was present, McKewan testified,"Bob Warren was present, John Seay, Craig Hitpas. I think Eddie Cooper was, but I'm not certain." *Id.* at 25 (emphasis added). Furthermore, McKewan disputes Books-A-Million's contention in subsequent testimony. *Plaintiff's Affidavit* at ¶ 36.

[10] Plaintiff contends that this is a "topless bar." *Opponent's Responsive Submission in Response to Exhibit D of the Court's Order* at 2 [Non-Movant's Brief].

[11] Books-A-Million contends that McKewan knew Wilborn's invitation was a joke because McKewan testified that she believed "he thought it was entertaining to ask me." *Plaintiff's Deposition* at 69. McKewan does not dispute her testimony, but she maintains that it was not a joke, but rather "a cruel taunting." *Plaintiff's Affidavit* at ¶ 37. Books-A-Million objects to McKewan's characterization of this incident because McKewan lacks personal knowledge about Wilborn's intent. *Defendant's Motion to Strike* at 1-3. On the other hand, McKewan claims that her characterization is a reasonable "inference," which is due the non-movant upon consideration of summary judgment. *Plaintiff's Opposition to Motion to Strike* at ¶ 9. Furthermore, McKewan is competent to testify as to her perception of the incident. Fed. R. Evid. 701.

8

discussing a problem with toilets backing up because women had been flushing sanitary products. Wilborn told the manager, "You've got to make sure that you don't flush those things down the toilet. If it doesn't come out of your body, its not supposed to go down there." *Plaintiff's Deposition* at 139. Later, McKewan overheard Wilborn tell a co-worker that the "goofy broads didn't realize that those things weren't supposed to be flushed down the toilet." *Id.*

On December 5, 1994, McKewan, Wilborn and another co-worker were inspecting a sample chair to go into stores. After McKewan commented on how nice the chair would be for reading, Wilborn asked McKewan what types of books she would like to read in the chair. McKewan responded that she would like to read legal thrillers or mysteries. Wilborn stated that he would like to read picture books in the chair. McKewan asked Wilborn what type of picture books, and Wilborn replied "one [sic] with plenty of naked women." *Id.* at 27. Wilborn then commented to the other co-worker "on how easy it was because she [McKewan] set herself up." *Plaintiff's Notes* at 5.

On December 23, 1994, McKewan overheard Wilborn tell a group of co-workers about a story he heard on the radio involving a woman who had been shipwrecked for three days; the woman said that the only reason she survived was because her breasts were so large they kept her afloat and that she was thankful to have them.[12]

---

[12] McKewan, but not Books-A-Million, claims that she did not overhear this conversation of her own volition, but rather, because the conversation took place in close proximity to her work station and because "Mr. Wilborn raised his voice and did not hold back his laughter and exclamations of sexual interest." *Plaintiff's Affidavit* at ¶ 46.

9

By the end of December, the "'cuss word' board" was removed, and employees were instructed, "it had better not reappear." Also, during this month, Germanson asked McKewan "if things had stopped." *Plaintiff's Notes* at 3. McKewan told her "no," and commented that "another female employee seemed to joke with [Wilborn] and participate in his questionable conversations." *Plaintiff's Notes* at 5.

On January 3, 1995, Wilborn pointed out a book about breast-feeding. Wilborn testified, and Books-A-Million admits, that the book "appeared" on his desk, and that he did not know who put it there. *Wilborn's Deposition* at 105-06. McKewan makes claims, not about how the book came to be at Wilborn's desk, but that Wilborn kept it there and brought it out "on a regular basis." *Plaintiff's Deposition* at 25. Books-A-Million admits only that Wilborn made comments about the book to "some of the guys in [his department]," specifically about the chapter on "breast-feeding twins." *Wilborn's Deposition* at 106-07. McKewan testified that Wilborn twice "brought the book out," he "made fun of [the book]," he displayed parts of the book to co-workers, and she was present on one such occasion. *Plaintiff's Deposition* at 25-26; *Plaintiff's Affidavit* at ¶ 42.

On January 5, 1995, McKewan overheard[13] Wilborn tell a story to someone in a phone conversation about a female store manager. Books-A-Million admits that Wilborn said that the store manager could not tell whether her store lights were on at night and that Wilborn commented on her stupidity. *Plaintiff's Deposition* at 128; *Wilborn's Deposition* at 112-13. McKewan now argues that there was no occasion when a store manager had been unable

---

[13]McKewan, but not Books-A-Million, claims that she did not overhear this conversation of her own volition, but rather, because the conversation took place in close proximity to her work station and because Wilborn did not lower his voice. *Plaintiff's Affidavit* at ¶ 43.

10

to tell whether her store lights were on at night,[14] that Wilborn's statement about "lights on at night" was his way of ridiculing the woman. *Plaintiff's Affidavit* at ¶ 43. Books-A-Million contends that McKewan is not competent to testify about Wilborn's intent in this regard. *Defendant's Motion to Strike* at 1-3.

On January 10, 1995, McKewan overheard phone calls that Wilborn made on his speaker phone to a recorded message offering sexually explicit material for a fee. Books-A-Million and McKewan dispute the circumstances of this incident in two respects. First, Books-A-Million claims that Wilborn's first call was a mistake, that he intended to reach a contractor's pager at 1-800-SKY-PAGE, but mistakenly dialed 1-800-SKY-GAPE. *Wilborn's Deposition* at 85-86, 90-91. McKewan claims that Wilborn's first call was no mistake, that he made no pretense of trying to call a contractor's pager, but intentionally called a "sex line." *McKewan's Affidavit* at ¶ 44. Books-A-Million contends that McKewan is not competent to testify about Wilborn's intent in this regard. *Defendant's Motion to Strike* at 1-3.

Second, Books-A-Million claims that the recorded message overheard by McKewan was an advertisement offering sexually explicit material if the caller remained on the line. *Wilborn's Deposition* at 85-86. McKewan claims that the "introduction" she overheard was

---

[14]McKewan makes this claim in her affidavit submitted to the court in opposition to the motion for summary judgment, but in her deposition she testified as follows:

> There was an incident where Mr. Wilborn was on the phone with someone, and he was telling him about a store manager, a woman, who was so stupid she couldn't tell if her lights were on at night above her store. *Plaintiff's Deposition* at 128.

sexually explicit, "lasted a few minutes" and gave a free preview of what could be purchased. *Plaintiff's Affidavit* at ¶ 45, 47.

Wilborn's co-workers who heard the phone call, found the incident amusing[15] and encouraged Wilborn to redial the number,[16] which he did. *Wilborn's Deposition* at 85-86. On neither call did anyone stay on the line past the toll-free portion of the call.

On January 11, 1995, McKewan spoke to Kelley about the speaker phone incident, Wilborn having already reported the incident to Kelley. McKewan claims that others also complained to Kelley. *Plaintiff's Notes* at 6; *Plaintiff's Affidavit* at ¶ 48. In any case, Kelley informed McKewan that Wilborn would be reprimanded for the incident. Kelly did give Wilborn a written reprimand, warned him that any further incidents would result in his termination, and required him to attend an individual sexual harassment training course at his own expense, which he did. Germanson and Lew Burdette, Vice-President of Books-A-Million, also spoke to Wilborn about the "sex line calls."

On January 12, 1995, McKewan overheard[17] Wilborn, while on the telephone with an unknown third party, comment about posters in the office. Wilborn said that it was unfair

---

[15] Books-A-Million claims that the co-workers found the content of the message "funny" based upon McKewan's deposition testimony that "the other men in the area found it very amusing . . . ." *Plaintiff's Deposition* at 30. McKewan claims what the co-workers found amusing was not the content of the message, but Wilborn's willingness to broadcast it repeatedly at work. *Plaintiff's Affidavit* at ¶ 46.

Subsequently, Books-a-Million moves the court to strike McKewan's affidavit testimony, but not her deposition testimony, in this regard. *Defendant's Motion to Strike* at 5. Therefore, Books-A-Million seems willing to accept only McKewan's characterization of the incident that is more favorable to it. Nevertheless, the reason that Wilborn's behavior was "amusing" to his co-workers remains in dispute.

[16] Books-A-Million's contention that Wilborn pressed the redial button rather than manually redial the number is unsupported by any evidence before the court.

[17] McKewan, but not Books-A-Million, asserts that she did not overhear this conversation of her own volition, but rather, because the conversation took place in close proximity to her work station and because Wilborn did not lower his voice. *Plaintiff's Affidavit* at ¶ 49.

12

that women in the office had a poster of "Topaz Man" when he was not allowed to have a

poster of a woman in a bikini at his desk. Wilborn explained that he was told to remove his

poster because it might be "considered sexual harassment." Wilborn then told the person

on the phone, while staring at McKewan, that his response had been, "Tell me who is

complaining because I will show this woman what sexual harassment is."[18] Wilborn's

poster had been removed before McKewan came to work at Books-A-Million, and

McKewan had never seen Wilborn's poster nor had she ever complained about his poster.[19]

On other occasions, McKewan overheard[20] comments made by Wilborn that

offended her. The parties agree that she overheard Wilborn comment to a co-worker that

he did not believe that a certain female employee wore a bra. McKewan asserts that

---

[18]McKewan asserts that this was a direct threat of retaliation aimed at McKewan because he stared directly at her while he spoke his threat into the telephone. *McKewan Affidavit* at ¶ 21. Books-A-Million disputes this assertion and moves to strike McKewan's testimony in this regard. *Movant's Reply Submission in Response to Exhibit D of the Court's Order* at iii [Movant's Brief]; *Defendant's Motion to Strike* at 5-6.

Books-A-Million argues that McKewan's affidavit testimony is contradicted by her prior deposition testimony. *Defendant's Motion to Strike* at 5-6 (citing *Plaintiff's Deposition* at 118). However, McKewan's deposition testimony that Wilborn did not "mention [her] name" does not contradict her affidavit testimony that he stared at her while he spoke that threat.

Books-A-Million also argues that McKewan lacks personal knowledge of Wilborn's intention when he spoke the threat, making her incompetent to testify about his intention. *Defendant's Motion to Strike* at 5-6. Nevertheless, the fact that Wilborn stared directly at her when he spoke his threat is uncontroverted. The disputed fact is whether he directed a threat at McKewan.

[19]The parties dispute the content of Wilborn's poster. Books-A-Million claims that Wilborn's poster depicted a woman in a bikini with the head of Hillary Clinton superimposed. *Wilborn's Deposition* at 110. McKewan claims that the poster was not related to Hillary Clinton or anything remotely political, but rather the poster was about a movie entitled "something like 'Beautiful Beach Babes from Beyond.'" *Plaintiff's Notes* at 6; *Plaintiff's Affidavit* at ¶ 49.

Books-A-Million moves the court to strike McKewan's testimony regarding the content of the poster because McKewan admitted that she never saw the poster. *Defendant's Motion to Strike* at 6-7 (citing *Plaintiff's Deposition* at 121-22). McKewan does not oppose defendant's motion to strike as to the content of the poster. *Plaintiff's Opposition to Motion to Strike*. However, the depiction of a woman in a bikini in the poster is uncontroverted.

[20]McKewan, but not Books-A-Million, asserts that she did not overhear this conversation of her own volition, but rather, because the conversation took place in close proximity to her work station and because Wilborn did not lower his voice. *Plaintiff's Affidavit* at ¶ 51.

Wilborn's comments about this female employee went even further to include comments about her body, tight clothes she wore and her appearance "when she came out of a cold area." *Plaintiff's Deposition* at 28-29; *Plaintiff's Affidavit* at 51. Additionally, Books-A-Million admits that Wilborn referred to McKewan as a "goofy broad." McKewan claims that Wilborn "regularly" referred to her and other women as "goofy broads." *Plaintiff's Deposition* at 128; *Plaintiff's Affidavit* at 52.

On the other hand, McKewan may have referred to someone as an "idiot." Also, McKewan used words such as "shit" or "damn" at work. In fact, effectively all co-workers in McKewan's work area, including McKewan, used curse words, but McKewan did not complain about anyone's language but Wilborn's. McKewan, however, maintains that Wilborn's use of profanity was "by far most frequent," "loudest," and used to express animus against women.[21] *Plaintiff's Deposition* at 96; *Plaintiff's Affidavit* at ¶ 53.

Finally, McKewan overheard frequent comments from both male and female co-workers to the effect that "you had better be careful because Jill [McKewan] is there and we don't want to upset her." *Plaintiff's Deposition* at 16, 39.[22] The result, according to McKewan, is that Wilborn made her feel "like an outcast." *Id.* at ¶ 13.

---

[21] Books-A-Million moves the court to strike McKewan's testimony about Wilborn's intent because she lacks personal knowledge, making her incompetent to testify in this regard. *Defendant's Motion to Strike* at 5. However, McKewan is competent to testify about her state of mind regarding Wilborn's comments, and the court will consider this testimony only to that extent. Fed. R. Evid. 701.

[22] McKewan asserts and Books-A-Million denies that Wilborn, in response to McKewan's complaints, involved their co-workers, portraying her as someone who was out to get everyone in trouble for no reason. *Plaintiff's Affidavit* at ¶¶ 13, 14. Additionally, Books-A-Million moves the court to strike McKewan's testimony about Wilborn's actions because she has not established that she has personal knowledge of those actions. *Defendant's Motion to Strike* at 2-5. This being true, McKewan, nevertheless, is competent to testify as to her state of mind about what Wilborn may have done, and the court will consider her testimony only to that extent. Fed. R. Evid. 701.

On January 16, 1995, McKewan resigned her employment with Books-A-Million. She claims, and Books-A-Million disputes, that she quit because she could no longer tolerate the on-going misery created by Wilborn at work. *Plaintiff's Affidavit* at ¶ 22.

In summary, McKewan and Books-A-Million agree to the following: 1) Wilborn was guilty of inappropriate words and conduct, cursing at work throughout the day on most days; 2) Wilborn's words and conduct were, to some extent,[23] related to sex and gender; 3) Wilborn had a prior history of similar offenses, of which Books-A-Million was aware, even before McKewan complained; and 4) Books-A-Million was aware that McKewan found Wilborn's words and conduct to be offensive.

## III.   **Summary Judgment Standard.**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The

---

[23] Although the parties agree that Wilborn used profanity at work "on most days," they dispute the frequency with which he referred to women in a demeaning way. McKewan claims and Books-A-Million denies that, "on most days," Wilborn used the phrase "goofy broads," and/or referred to women's bodies and appearance, and/or insulted women's supposed lack of intelligence. *Plaintiff's Affidavit* at ¶ 6.

movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's

function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

17

## IV.  Discussion.

The plaintiff, McKewan, claims: (1) she was subjected to a sexually hostile work environment; (2) her employer retaliated against her because she complained; and (3) she was constructively discharged. The court will discuss each claim and the defendant's motion with respect to each claim in turn.

### A.  Sexual Harassment—Hostile Environment Claim.

Books-A-Million seeks summary judgment on the hostile environment claim for two reasons: (1) the conduct about which McKewan complains is not based upon sex; and (2) the conduct is not sufficiently severe and pervasive to create a hostile environment actionable under Title VII. *Movant's Initial Submission in Response to Exhibit D of the Court's Order*, at 2 [Movant's Brief]. The prima facie case of hostile environment sexual harassment requires the plaintiff to prove each of the following: (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon gender; (4) the harassment complained of was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive work environment; and (5) some basis for institutional liability has been established. *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982). Books-A-Million argues that McKewan cannot establish the third and fourth elements of a hostile environment sexual harassment claim.

First, considering whether the conduct about which McKewan complains is based upon gender, Title VII protects an employee from discrimination by her employer "because of" such individual's sex.  42 U.S.C. § 2000e-2.  In proving a claim for hostile environment

18

sexual harassment, the plaintiff must show that "but for the fact of her sex, she would not have been the object of harassment." *Henson*, 682 F.2d at 904. In cases where the conduct complained of is equally offensive to male and female workers, the sexual harassment would not be based upon gender because men and women were accorded like treatment. *Id.*

Books-A-Million argues that the "vast majority" of incidents in the workplace about which McKewan complains bear no relationship to her gender. *Movant's Initial Submission in Response to Exhibit D of the Court's Order*, at 3 [Movant's Brief]. The court agrees that much of the conduct attributed to Wilborn would be equally offensive to both male and female workers and, as such, is not material to a determination of hostile environment sexual harassment. This non-material conduct includes Wilborn's use of profanity in conversations with others, indiscriminate rudeness toward others, insulting comments about his male supervisor, Kelly, and anger toward other male co-workers. Such conduct would not in a general sense be gender-related. On the other hand, a reasonable jury could find that much of Wilborn's conduct, about which McKewan complains, was gender-related.

Also in dispute is whether all of Wilborn's conduct, about which McKewan complains, was directed at her. Wilborn directed some of his words, actions, and conduct at McKewan personally. There are factual disputes regarding other incidents that McKewan merely overheard. McKewan asserts that Wilborn often engaged in conduct and words in proximity to her work station with the intent that she would be exposed to them and that, in that sense, they were directed at her. *Plaintiff's Affidavit* at ¶¶ 43, 46, 49, 51. On

19

this evidence, a reasonable jury could find that even these incidents were directed at McKewan because of her gender.

Next, the court considers whether the conduct, about which McKewan complains, is sufficiently severe and pervasive to create a hostile environment. This determination has both an objective and a subjective component. First, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Systems, Inc.*, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295, 302-03 (1993). Second, "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris*, 114 S. Ct. at 371, 126 L. Ed. at 302.

As to the objective component, the court must look at "all the circumstances" to determine whether the work environment was hostile or abusive. *Id.* These circumstances may include: (1) frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Id.*

In this case, the frequency of some of Wilborn's comments is in genuine dispute. For example, McKewan claims that, "on most days," Wilborn referred to her and other women as "goofy broads." *Plaintiff's Deposition* at 128; *Plaintiff's Affidavit* at 6. Books-A-Million admits that Wilborn used that term, but not "regularly." Also, McKewan claims, and Books-A-Million denies, that Wilborn referred to women's bodies and appearance and/or insulted women's supposed lack of intelligence "on most days." *Plaintiff's Deposition* at

20

28-29; *Plaintiff's Affidavit* at ¶ 51. The severity of Wilborn's behavior is also in genuine dispute. For example, the parties dispute whether Wilborn's invitation to "Sammy's" was just a joke or "cruel taunting." Also, the parties dispute the extent to which Wilborn displayed the book on breast-feeding, the extent of Wilborn's comments about a certain female co-worker's appearance, and the offensiveness of the "sex line" call.

Finally, McKewan does not allege any behavior that is physically threatening or humiliating. But, she claims that Wilborn's behavior did unreasonably interfere with her work performance to the extent that she resigned. *Plaintiff's Affidavit* at ¶ 22.

Accordingly, considering all the undisputed facts, construing the disputed facts in favor of the nonmovant, and giving the nonmovant the benefit of any reasonable inference, a reasonable jury could find Wilborn's conduct sufficiently severe and pervasive to create a hostile environment. Therefore, the court finds that the plaintiff has demonstrated genuine issues of material fact for the purpose of overcoming the defendant's motion for summary judgment on the hostile environment sexual harassment claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (holding the nonmovant must designate facts showing there is a genuine issue for trial).

## B. Retaliation Claim.

Books-A-Million seeks summary judgment on the retaliation claim[24] based upon its contention that McKewan cannot establish an "adverse employment action" necessary for her prima facie case under Title VII. *Movant's Initial Submission in Response to Exhibit D of the Court's Order*, at 12 [Movant's Brief]. In order to make out a prima facie case of retaliation, McKewan must show (1) that she was engaged in statutorily protected expression, (2) that Books-A-Million took adverse employment action against her, and (3) a causal link between the protected expression and the adverse action. *Lindsey v. Mississippi Research and Dev. Ctr.*, 652 F.2d 488, 491 (5th Cir. 1981). Books-A-Million argues that McKewan cannot establish the second element of her retaliation claim. *Movant's Initial Submission in Response to Exhibit D of the Court's Order*, at 12 [Movant's Brief].

As to the first element, McKewan argues that, when she opposed practices made unlawful by Title VII,[25] Wilborn made threats against her and incited others in the workplace to shun and taunt her. *Opponent's Responsive Submission in Response to Exhibit D of the Court's Order* at 9-10 [Non-Movant's Brief]. In the Eleventh Circuit, "statutorily protected expression" includes: (1) filing an EEOC charge; 42 U.S.C. § 2000e-3(a); (2) formal and informal complaints to an employer; *Rollins v. State of Fla. Dep't of*

---

[24] Title VII protects employees from discrimination by their employer "because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3.

[25] A plaintiff need not prove the actual existence of those unlawful employment practices; rather, he or she need only have a reasonable belief that the defendant engaged in such practices. *Wu v. Thomas*, 863 F.2d 1543, 1549 (11th Cir. 1989); *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A 1981), *cert. denied*, 455 U.S. 1000 (1982).

*Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989); (3) written protests; *Smalley v. City of Eatonville*, 640 F.2d 765, 769 (5th Cir. Unit B 1981); and (4) warnings from employers not to complain about alleged discriminatory practices. *Morgan v. City of Jasper*, 959 F.2d 1542, 1547 (11th Cir. 1992). Because McKewan made both formal and informal complaints to her employer, a reasonable jury could find that McKewan participated in a "statutorily protected expression" when she complained to her employer about Wilborn's behavior.

As to the second element of her retaliation claim, the parties dispute whether Books-A-Million took "adverse employment action" against her because of her complaints. In the Eleventh Circuit, adverse employment action includes such things as ongoing harassment after a complaint is made and verbal confrontations by a supervisor. *Meeks v. Computer Associates Int'l*, 15 F.3d 1013, 1015, 1021 (11th Cir. 1994). McKewan asserts, and a reasonable jury might find, that Wilborn's behavior not only continued, but became more hostile towards McKewan after she complained. For the purposes of summary judgment, there is sufficient evidence upon which a reasonable jury might find an adverse employment action.

As to the third element of her prima facie case of retaliation, McKewan must show a causal connection between the protected expression and the adverse employment action. In the Eleventh Circuit, this requirement is interpreted broadly; "a plaintiff merely has to prove the protected activity and the negative employment action are not completely unrelated." *EEOC v. Riechhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1991). McKewan has met her burden as to the third element because the adverse employment action of which she complains continued, and possibly escalated, after her complaints to

23

her employer. *See Meeks*, 15 F.3d at 1021. Therefore, a reasonable jury could find the required causal connection.

Accordingly, McKewan has met her burden on summary judgment by showing a genuine issue of material fact as to her retaliation claim.

## B.   Constructive Discharge.

Books-A-Million seeks a summary judgment on McKewan's constructive discharge claim based upon its contention that McKewan resigned voluntarily.[28] *Movant's Initial Submission in Response to Exhibit D of the Court's Order*, at 15-17 [Movant's Brief]. In order to prove a constructive discharge claim, McKewan must "demonstrate that the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." *Virgo v. Riviera Beach Associates, Ltd.*, 30 F.3d 1350, 1363 (11th Cir. 1994). "Part of an employee's obligation to be reasonable is not to assume the worst, and not to jump to conclusions too fast." *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987). Next, in order to prove a violation of Title VII, McKewan must show that the intolerable working conditions were the result of a hostile environment caused by sexual harassment. *Wardell v. School Bd. of Palm Beach Co.*, 786 F.2d 1554, 1557 (11th Cir. 1986).

In the Eleventh Circuit, an intolerable condition sufficient for constructive discharge includes such things as a supervisor lavishing unwelcome attention upon his subordinate,

---

[28]Books-A-Million also argues that if McKewan's allegations do not support a hostile environment claim, they cannot support a constructive discharge claim. *Movant's Initial Submission in Response to Exhibit D of the Court's Order*, at 15-17 [Movant's Brief]. While this is true, McKewan has produced sufficient evidence for her hostile environment claim to survive summary judgment.

even after he was no longer her supervisor, because of the possibility that he might become her supervisor again in the future. *Morgan v. Ford*, 6 F.3d 750, 756 (11th Cir. 1993). However, as a matter of law, an intolerable condition sufficient for constructive discharge does not include such things as a mere increase in workload. *Wardell*, 786 F.3d at 1557. Likewise, a constructive discharge claim is not valid when the plaintiff does not allow sufficient time for the employer to correct the situation. *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996).

In this light, a reasonable jury could find that McKewan's workplace was sufficiently intolerable to cause a reasonable person to resign. As set out above, McKewan complained to her employer on at least four separate occasions over a four month period, and Wilborn's offensive behavior continued unabated despite repeated reprimands. McKewan allowed ample time for her employer to remedy the situation, but saw no improvement.

Accordingly, McKewan has met her burden on summary judgment as to the constructive discharge claim by showing a genuine issue of material fact as to whether her workplace was sufficiently intolerable because of any sexual harassment from Wilborn.

## V.   Conclusion.

The defendant's motion for summary judgment will be denied. The court will enter

an appropriate order in conformity with this memorandum opinion.

Done, this _____ of September, 1997.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE